2017 IL App (1st) 171332
No. 1-17-1332
Opinion filed December 29, 2017

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| *In re* R.H., a Minor | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
|  |  | No. 17 JD 331 |
| (The People of the State of Illinois, Petitioner-Appellee, v. R.H., Respondent-Appellant). |  | The Honorable William G. Gamboney, Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Presiding Justice Neville dissented, with opinion.

**OPINION**

¶ 1      When an adolescent's behavior crosses the legal line from imprudent and irresponsible to criminal conduct, the State steps into the role of the parent and, through the doctrine of *parens patriae* and the juvenile court system, attempts to set the adolescent on a more productive path through life. Toward this end, juvenile courts have had to grapple with adjudicated delinquent minors' use of social media in the context of conditions of probation.

¶ 2      Here, a juvenile court, as a condition of probation for an adjudicated delinquent minor's own protection, required the removal of any references to gangs, guns, or drugs on the minor's

social media accounts. The minor asserts that this condition of probation violates constitutionally-protected free speech.

¶ 3    R.H. is not the only juvenile who has received a similar probation restriction. Just after we heard oral argument, another division of this court issued a decision striking the restriction as unconstitutional. *In re Omar F.*, 2017 IL App (1st) 171073. We asked the parties to submit supplemental briefs on *Omar F.*'s relevance to R.H.'s case.

¶ 4    We disagree with *Omar F.* We hold that this content-based restriction on speech passes strict scrutiny, as it is narrowly tailored. And, given the State's responsibility to its juvenile probationers, the State has a compelling interest in restricting social media and related activity to protect adjudicated delinquent minors from destructive and antisocial influences and prevent reoffending.

¶ 5                                  Background

¶ 6    The State filed a petition for adjudication of wardship for 16-year-old R.H., charging him with aggravated unlawful use of a weapon, unlawful possession of cannabis, and unlawful possession of cannabis with the intent to deliver.

¶ 7    R.H. admitted gang membership. His social media accounts included photographs of R.H. with a gun, making "gang signs" with fellow gang members, and smoking cannabis. In his social media postings, R.H. wrote about his own gang and denigrated members of rival gangs. In 2016, after someone shot R.H., he refused to cooperate with police. Later, he dropped out of school fearing harm for his gang affiliation.

¶ 8    The trial court found R.H. guilty of the offenses and placed him on two years of probation. Among the conditions of probation, the trial court ordered that R.H. have no contact with "any gangs, guns, or drugs which means it looks to me, [R.H.], you need to get some new

friends." The trial court also ordered that R.H. delete from his social media accounts "all references to gangs, guns, or drugs." (The parties at oral argument agreed that the order encompasses both deleting posts and refraining from posting new items as he was ordered to have no "contact" with gangs, guns, or drugs.)

¶ 9                                                                      Analysis

¶ 10        R.H. contends that the probation condition restricting him from posting about gangs, guns, or drugs on social media is an unconstitutional content-based restriction that fails for lack of sufficiently narrow tailoring. (R.H. does not challenge the separate condition prohibiting him from "contact" with gang members, guns, or drugs.) The State responds that delinquent minors do not possess unlimited first amendment rights and the probation condition narrowly focused on R.H.'s rehabilitation.

¶ 11                                                                   Strict Scrutiny

¶ 12        First, we need to determine under what level of review we should examine the restriction. R.H. argues that this is a content-based restriction and thus requires strict scrutiny.

¶ 13        A government regulation of speech is content-based if the regulation applies to particular speech due to "the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015). A regulation targeting specific subject matter is content-based even if it does not discriminate among viewpoints within that subject. *Id.* at ___, 135 S. Ct. at 2230. R.H.'s order qualifies as a content-based restriction because it restricts his social media postings on three express topics (gangs, guns, and drugs), even without specifying whether the content is pro- or anti-gangs, guns, or drugs. Courts review content-based restrictions under a strict scrutiny standard, and the regulation must be "narrowly tailored to

serve compelling state interests." *Id.* at \_\_\_, 135 S. Ct. at 2226; *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 804 (2000).

¶ 14                                    Compelling Government Interest

¶ 15        The State's interest in restricting R.H.'s social media activity stems from its relationship with him as a juvenile probationer who has engaged in illicit, self-destructive activities. Under *parens patriae*, Illinois courts have more latitude in their approach toward disciplining juvenile offenders. *In re O.H.*, 329 Ill. App. 3d 254, 260 (2002). *Parens patriae* represents the "general power and obligation of the government as a whole to protect minors and the infirm." (Internal quotation marks omitted.) *In re D.S.*, 198 Ill. 2d 309, 328 (2001). *Parens patriae* power is codified in the Juvenile Court Act of 1987 (Juvenile Court Act or Act) (705 ILCS 405/1-1 *et seq.* (West 1998)), which explicitly "charges the circuit court with the duty to act in the best interests of the minor and for the minor's own protection." *D.S.*, 198 Ill. 2d at 328. Delinquency proceedings seek to protect and rehabilitate, not punish, minors. *In re B.S.*, 192 Ill. App. 3d 886, 891 (1989).

¶ 16        The Juvenile Court Act contains a nonexhaustive list of conditions juvenile courts may impose. One of these is that the minor "refrain from having any contact, directly or indirectly, with certain specified persons or particular types of persons, including but not limited to members of street gangs and drug users or dealers." 705 ILCS 405/5-715(2)(s) (West 2016). The trial court imposed this condition and ordered R.H. to have no contact with gangs, guns, or drugs. Though it implicates R.H.'s first amendment right to free assembly, he does not challenge this condition, nor does he address whether "contact" includes the type of social media activity that he does challenge.

¶ 17    The trial courts have considerable deference in fashioning probation conditions intended to rehabilitate. *People v. Kimbrell*, 291 Ill. App. 3d 605, 607 (1997). Courts may impose restrictions outside those the statute lists so long as the condition (i) is reasonable and (ii) has some connection between it "and either (a) the underlying crime or (b) the behavior or attitude of the defendant that the trial court thinks needs adjusting." *In re M.P.*, 297 Ill. App. 3d 972, 977 (1998).

¶ 18    In ascertaining the reasonableness of the social media probation condition imposed on R.H., we need to examine the behavior that led R.H. to be adjudicated delinquent. *People v. Stocke*, 212 Ill. App. 3d 547, 554 (1991). R.H. was arrested for possession with intent to deliver cannabis, possession of cannabis, and unlawful use of a weapon. R.H. has a history of criminal behavior, dropped out of school fearing gang retaliation, and had been shot. The gang information report indicated that R.H. was affiliated with the Unknown Vice Lords, a criminal street gang operating on Chicago's southwest side. Particularly relevant, R.H. used his social media accounts to taunt rival gang members and posted a number of pictures of himself displaying gang signs, posing with guns, and smoking what appears to be cannabis. R.H.'s past actions demonstrate the reasonableness of the probation condition. *Id.*

¶ 19    R.H.'s past postings of pictures of himself displaying gang signs, holding guns, and smoking cannabis foment and glorify criminal behavior. The postings also communicate to members of his gang and other gangs an endorsement of and a willingness to engage in criminal activities. Indeed, the implications of R.H.'s posts do not simply affect his chances of future employment; they put R.H., his family, and anyone else in his vicinity, in danger of bodily harm. We are mindful that social media postings like R.H.'s do not exist in a vacuum but sometimes, sadly, spill out into real-world violence. We conclude from all this that the State has a

compelling interest in restricting R.H.'s social media activity on these three related and insidious topics, closely related to his crimes, as a means of preventing him from further criminal acts.

¶ 20        Our conclusion is supported by case law allowing restrictions of speech by minors not on probation. Minors are entitled to some, but not all, of the constitutional protections traditionally afforded to adults. *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality op.). Different constitutional standards apply to minors because of "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Id.* at 634.

¶ 21        This distinction between minors and adults manifests in several obvious ways. Most relevant here, the creation of a separate court system for juveniles shows that the law treats minors and adults differently. *Id.* at 635. Schools need not tolerate speech by minors that disrupts their educational mission, even where the speech would be entitled to first amendment protection outside of the school context. *Hazelwood School District v. Kulhmeier*, 484 U.S. 260, 266 (1998). Curfew laws do not implicate constitutional questions so long as they properly further the State's compelling interest in protecting children. *People v. Chambers*, 66 Ill. 2d 36, 44 (1976).

¶ 22        We find further support in case law restricting the behavior of adult probationers, who cede some of their constitutional rights on conviction. *In re H.G.*, 322 Ill. App. 3d 727 (2001). A probation condition that implicates fundamental constitutional rights has to reasonably relate to the "compelling state interest in reformation and rehabilitation." (Internal quotation marks omitted.) *In re J.W.*, 204 Ill. 2d 50, 78 (2003). To be reasonable, a probation condition must narrowly focus on its rehabilitative goal. *In re J.G.*, 295 Ill. App. 3d 840, 843 (1998). In assessing a probation condition's reasonableness, courts also consider if (i) the probation

condition reasonably relates to rehabilitation, (ii) the value of the probation condition to society plainly outweighs the loss of the probationer's constitutional rights, and (iii) less restrictive means are available. *People v. Rizzo*, 362 Ill. App. 3d 444, 456 (2005). Courts also may look to the individual characteristics of the defendant. *Stocke*, 212 Ill. App. 3d at 554. Even if R.H. were an adult probationer, the social media restriction would meet these goals.

¶ 23                                    Narrow Tailoring

¶ 24        We must consider whether the order has been drawn narrowly to achieve its ends while also limiting its intrusiveness and whether the trial court could have achieved the same objective without imposing this probation condition as written. In so doing, we reiterate our supreme court's admonition that delinquency proceedings are not the equivalent of criminal prosecutions. See *In re Rodney H.*, 223 Ill. 2d 510, 520 (2006) (proceedings under Juvenile Court Act are not criminal); *In re W.C.*, 167 Ill. 2d 307, 320 (1995).

¶ 25        We find the restriction sufficiently narrow. The condition focuses on the goal of reforming R.H.'s behavior and steering him away from involvement with gangs, guns, and drugs. The order limits its reach to the matters specifically related to the exact behavior for which R.H. was adjudicated delinquent. This case is not like *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730 (2017), where a statute prohibited sex offenders from using any social networking site also used by minors. *Id.* at ___, 137 S. Ct. at 1733. The Supreme Court held that this violates the first amendment, as it prohibited all access to social media rather than prohibiting posting about particular topics. R.H. is not restricted from all social media activity. Instead, he is prohibited from posting about gangs, guns, and drugs, which is consistent with the statutory condition, also imposed but not challenged, prohibiting direct or indirect contact with "members of street gangs and drug users or dealers." 705 ILCS 405/5-715(2)(s) (West 2016); see

also *In re Hugo G.*, 322 Ill. App. 3d 727, 739 (2001) (upholding probation restriction prohibiting juvenile from associating with gang members).

¶ 26     Finally, R.H.'s social media activity is not incidental to the goal of rehabilitation, since adolescents often use social media to communicate with each other about their activities (including their illegal activities, as R.H. demonstrated). If the juvenile court has any hope of steering R.H. toward a new direction and productive life, it would be absurd to target only real-world behavior and ignore online activity. And if the trial court tried to restrict only postings that glorified guns, gangs, or drugs, R.H.'s probation officer would be in the impossible position of parsing each of his social media posts to determine a violation. For the restriction to be effective, it must be practical, it must be feasible, and it must be enforceable.

¶ 27     We are not faced with the issue of whether this restriction might or might not pass constitutional muster for an adult; rather, the issue concerns the constitutional rights of minors, and the constitutional rights of minors are neither equal to nor coextensive with those of adults. *Bellotti*, 443 U.S. at 633 (different constitutional standards apply to minors). For a juvenile probationer, the Act demands that the trial court intrude into the minor's private life and impede his or her constitutional freedoms to rehabilitate him or her. See *J.G.*, 295 Ill. App. 3d at 842 (main purpose of Juvenile Court Act to correct and rehabilitate); see, *e.g.*, *J.W.*, 204 Ill. 2d at 78 (recognizing that statutory condition prohibiting juvenile offender from entering geographic area restricts basic constitutional right to interstate travel but is not automatically invalid).

¶ 28     While not binding on this court, other jurisdictions have upheld similar probation conditions to that imposed on R.H. See *State v. H.L.M.*, No. 11-10-356, 2014 WL 1884320, *1, 6 (N.J. Super. Ct. App. Div. May 13, 2014) (condition of parole banning woman from referencing her family in future blog posts did not violate first amendment because ban was narrowly

tailored, protected victims of her crime, and advanced rehabilitation). And in ruling on a separate issue, this court itself has evaluated the constitutionality of similar restrictions. See *In re Sebeyoun W.*, 2017 IL App (1st) 161778-U (similar probation condition imposed where juvenile sentenced to probation for possessing gun with defaced identification marks).

¶ 29     The dissent contends that the trial court should be required to include an intent provision in the order, *i.e.*, that R.H.'s probation can only be revoked if it is shown that he knowingly violated a condition. This would be inconsistent with Illinois law, which states that conduct resulting in a probation revocation need not "be of a criminal nature, let alone criminally culpable." *People v. Allegri*, 109 Ill. 2d 309, 315 (1985) (finding insanity not valid defense to violation of probation condition). A defendant who does not even realize he or she is violating a condition can still have his or her probation revoked if the nonculpable conduct "frustrate[s] the goals of a probationary sentence." (Internal quotation marks omitted.) *People v. Jurisec*, 199 Ill. 2d 108, 121 (2002). Hence, we cannot read a "knowingly" requirement into a probation condition, as this would be contrary to the principles and goals of probation. *Allegri*, 109 Ill. 2d at 314 (recognizing "probation as a privilege"). If R.H.'s online activities frustrate the goals of his probation, then that probation can be revoked without a finding that he intended to violate a condition.

¶ 30     We also note that even though the wording suffices and the parties agree as to the order's meaning, this order, like many orders, in retrospect could have been worded more expansively. The trial court instructed R.H. to remove all "references" to gangs, guns, or drugs from his social media accounts but did not specify whether this referred to posting images, words, or both and did not instruct him whether he was permitted to make new posts on these subjects. Nor did it refer to other methods of electronic communication (such as e-mail or texting). When a trial

court issues a probation condition not specifically listed in the statute, extra care should be taken so that the probationer (particularly a minor) understands what constitutes compliance and potential noncompliance. Again, here, at oral argument, the parties acknowledged the order's meaning.

¶ 31        We recognize the difficulty of drafting an effective order consistent with constitutional demands and sensitive to the characteristics of young people engaged in delinquency. See *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (noting, because juveniles lack maturity, they are prone to "recklessness, impulsivity, and heedless risk-taking" and are more vulnerable to peer pressure). The dissent contends that the trial court should have named which gangs and which visual symbols, colors, or words associated with those gangs R.H. was prohibited from posting. But this is impractical and counterproductive.

¶ 32        The dissent's approach would require the trial court (along with R.H.'s probation officer) to acquire and maintain comprehensive knowledge of the gang identities and activities surrounding R.H., something that may or may not be consistent with his geographical location, and something that is constantly in flux due to the ever-changing fashions and interests of young adults like R.H.

¶ 33        If the trial court prohibited R.H. from posting pictures of himself wearing a Bulls jersey, based on information that a gang wearing Bulls jerseys operated a block from R.H.'s home, that prohibition would become stale the moment the members of that gang decided to change their shirts, move their activities, or splintered to form new, separate gangs. There is no practical way for the trial court to be able to keep up with this information. Further, R.H.'s social media presence (and the existence of Chicago public transportation) allows him to connect with gang members who might not live or operate within the boundary around R.H.'s physical location.

Limiting the prohibition to specific gangs in specific areas would allow R.H. to continue to connect with gang life, which is antithetical to rehabilitation.

¶ 34 The same impracticality extends to the dissent's suggestion that the trial court must define the word "gang." The trial judge, the probation officer, and, surely, R.H. know what "gangs" mean, and to suggest otherwise, as do the articles cited by the dissent, is sophistry. If the trial court aims for specificity, it runs the risk of making the order too narrow to cover the behavior that should be prohibited for the juvenile to rehabilitate him- or herself, and invites an uncooperative and resistant juvenile to find ways to maneuver around the prohibitions. Further, a juvenile who wants to comply with the order would likely find it easier to follow a broad prohibition ("no references to guns, gangs, or drugs") than one whose specifics require juveniles to engage in legal interpretation ("no references that glorify or attempt to glorify guns, gangs, or drugs", "no excessive references to guns, gangs, or drugs," or "no positive references to guns, gangs, or drugs"). There is no positive benefit to either R.H. or society for allowing R.H. to post about gangs in any context—there is no benefit to muddling the order with specifics.

¶ 35 The legislature has instructed us that an important purpose of the statute is for the trial court to rehabilitate the juvenile so that the minor can "mature into a productive member of society." 705 ILCS 405/5-101(1)(c) (West 2016). To ensure R.H.'s rehabilitation, the trial court needs flexibility to craft an effective probation condition. No matter the order's text, the juvenile court process will require the juvenile's probation officer and the trial court to use their discretion and common sense, always keeping in mind the purpose of the order is to rehabilitate, reduce future offending, and foster the errant youth's accountability. See 705 ILCS 405/5-101(1) (West 2016); see also *W.C.*, 167 Ill. 2d at 320 (delinquency proceedings are "protective" and purpose of Juvenile Court Act "is to correct and rehabilitate, not to punish").

¶ 36                                   Second-Prong Plain Error

¶ 37        Even if we had found constitutional error, R.H.'s claim would still fail because he cannot pass the second prong of the plain error test. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (if error not preserved in trial court, defendant must show that clear or obvious error occurred and either (i) evidence is so closely balanced that error alone threatened to tip scales against defendant or (ii) error was so serious that it affected trial's fairness and challenged integrity of judicial process). R.H. claims that the restriction on his first amendment rights is "serious" error.

¶ 38        We disagree; an error that challenges the integrity of the judicial process is one like that in *Thompson*, where a trial court fails to ensure that jurors understand and accept important concepts like the presumption of innocence. *Id.* at 606. Nor is this case similar to *People v. Lewis*, 234 Ill. 2d 32 (2009), where a trial court imposed a "street-value" fine on a defendant without making any evidentiary finding as to the actual "street-value" of the drugs Lewis had sold. *Id.* at 35. Our supreme court concluded that this was "serious" plain error because without evidence on the value of the drugs, "the fine has no basis in the statute or the evidence and will be arbitrary." *Id.* at 48. That arbitrariness affected the proceeding's fairness and implicated the integrity of the judicial process. *Id.* Nothing like that happened here. R.H. has not alleged that the trial court lacked evidence establishing the relevance of his social media posts to his crimes and his rehabilitation. Nor was R.H. deprived of an opportunity to question the probation condition. Just because an error implicates the constitution does not turn it into a "serious" error.

¶ 39                                   The Relevance of *Omar F.*

¶ 40        While R.H.'s case was pending, another division of this court issued its decision in *Omar F.*, 2017 IL App (1st) 171073. Omar F., a minor, was charged with armed robbery with a

firearm, aggravated robbery, and robbery and adjudicated delinquent. *Id.* ¶¶ 3, 21. The social investigation revealed similar past charges, and Omar admitted that his friends were "gang involved," though he denied being in a gang himself. *Id.* ¶¶ 23, 25. Omar stated that he admired his older brother because he had " 'been in the system before but has turned his life around.' " *Id.* ¶ 26. The trial court sentenced Omar to probation and told him to " 'stay away from gangs, guns, and drugs' " and to " 'clear those from [your] social media.' " *Id.* ¶ 31.

¶ 41        On appeal, the court found that these two conditions were overbroad and not narrowly tailored. *Id.* ¶ 60. While restricting Omar's real or online contact with gang members was reasonably related to rehabilitative goals, the restrictions did not allow for any exceptions for legitimate purposes or provide enough guidance to avoid violating the orders. *Id.* ¶ 63. The court went on to find that these restrictions constituted second-prong plain error, stating that if the restrictions were so vague that if Omar could inadvertently violate them while acting in a constitutionally protected manner, "then the judicial process is not functioning as intended." *Id.* ¶ 68.

¶ 42        Having asked the parties to address *Omar F.*, we will explain why we decline to follow its lead. First, *Omar F.* is factually distinguishable, as its analysis focused on the restriction from "contact" with gang members (as opposed to restrictions on particular social media topics). The *Omar F.* court was particularly concerned by the no-contact order because it could potentially prohibit Omar from seeing gang members in family or educational settings; worse, Omar could potentially violate the probation restriction without meaning to or even knowing he was violating it. *Id.* ¶ 63.

¶ 43        Those concerns are not present here. R.H. is not challenging the "no contact" order, only the restriction on his social media topics. R.H. controls his own social media accounts and can

simply avoid posting about the prohibited topics; unlike Omar, he does not need to worry about inadvertent contact with guns, gangs, or drugs in his social media accounts. (And, as explained, there is no requirement that R.H.'s probation can only be revoked from a deliberate violation of a probation condition.) We do not see why R.H. needs any kind of exception from this limited restriction in his online life. Nor is there any potential, irreplaceable value in allowing R.H. to post about these topics, unlike Omar, who could conceivably be rehabilitated through the good influence of family members with crimes in their pasts or getting an education. R.H. can certainly rehabilitate himself without posting about guns, gangs, or drugs.

¶ 44    Second, *Omar F.*'s conclusion that the restriction is overbroad and not narrowly tailored does not address the specific restriction here. *Omar F.* focuses on the "no contact" order and does not distinguish between that and the restriction on social media topics. Instead, it muddles the two restrictions together by noting that "contact" could include both physical, in-person contact, and contact through "online social platforms." *Id.* ¶ 61. That is undoubtedly true—but again, R.H. does not contest the restriction on "contact," only the restriction on certain topics online.

¶ 45    Finally, we strongly disagree with *Omar F.*'s conclusion that the restriction constitutes "serious" plain error. The only precedent cited by *Omar F.* is *Lewis*, 234 Ill. 2d at 48, which, as explained, is not on point. The "serious error" category is meant to be limited and not to hold every potential error that has constitutional implications; *most* errors that occur in a sentencing hearing have some constitutional aspect.

¶ 46    Finding no constitutional error, we decline to address R.H.'s argument that the alleged error should be reviewed as ineffective assistance of counsel.

¶ 47    Affirmed.

¶ 48   PRESIDING JUSTICE NEVILLE, dissenting.

¶ 49   Because the probation condition in the juvenile court's order violates R.H.'s right to due process, I respectfully dissent.

¶ 50   The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2016)) gives the juvenile court broad discretion to impose conditions on the probation of minors found delinquent. 705 ILCS 405/5-715 (West 2016). But "[t]he court's discretion is limited by constitutional safeguards and must be exercised in a reasonable manner." *In re J.W.*, 204 Ill. 2d 50, 77 (2003). To comport with R.H.'s right to due process, the probation condition "must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated." (Internal quotation marks omitted.) *In re Sheena K.*, 153 P.3d 282, 294 (Cal. 2007); see *United States v. Loy*, 237 F.3d 251, 262 (3d Cir. 2001) (a probation condition violates due process of law if it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily question its meaning and differ as to its application).

¶ 51   The juvenile court here, as a condition of probation, restricted R.H. from posting to his social media accounts any "references to gangs." But "[e]xperts studying gangs agree with the Supreme Court and consider the term 'gang' 'notoriously imprecise.' Scott Cummings & Daniel J. Monti, *Gangs—The Origins and Impact of Contemporary Youth Gangs in the United States* 278 (1993); Robert K. Jackson & Wesley D. McBride, *Understanding Street Gangs* 20 (1992) (meaning of 'gang activity' is 'as varied as the background and perspectives of those attempting to define it')." *Stephenson v. Davenport Community School District*, 110 F.3d 1303, 1309 (8th Cir. 1997). When a regulation proscribes gang activity, the regulation must define the term "gang." *City of Harvard v. Gaut*, 277 Ill. App. 3d 1, 7 (1996); *Stephenson*, 110 F.3d at 1309. For

the probation condition to provide any guidance, it must define the term "gang" with sufficient clarity that R.H. can determine whether the court will find that he violated the conditions of probation by referring to the Medillin cartel, the Russian mafia, the Ku Klux Klan, or political parties closely affiliated with such organizations. I suggest that the court should specify in the order the gangs to which R.H. must make no reference, and the list should include the gangs that operate in the areas where R.H. lives or works or goes to school or any other areas where R.H. regularly appears.

¶ 52     Even if the order defines or lists gangs, the order does not comport with the requirements of due process unless it explains what counts as a reference to a gang. The probation condition does not take into consideration the pictorial, nonverbal nature of much of social media. In *Stephenson*, Stephenson wore a tattoo in the shape of a crucifix, and a court found that the tattoo violated an order prohibiting Stephenson from displaying gang symbols. The *Stephenson* court explained:

> "[C]ommon religious symbols may be considered gang symbols under the District regulation. The meaning of Stephenson's tattoo, a cross, is contested by the parties as Stephenson considers it simply a form of 'self-expression' while Appellees believe it is a gang symbol. A significant portion of the world's population, however, views it as a representation of their Christian religious faith. Indeed, the list of 'prohibited' materials under the regulation includes other potential religious symbols. See *The City of Harvard v. Gaut*, 277 Ill. App. 3d 1, 214 Ill. Dec. 68, 660 N.E.2d 259, 261 (1996) (officers testifying at hearing 'acknowledged that the six-pointed star is a symbol of Judaism as well as of the gangs affiliated with the Folk Nation'). ***

* * *

Sadly, gang activity is not relegated to signs and symbols otherwise indecipherable to the uninitiated. In fact, gang symbols include common, seemingly benign jewelry, words and clothing. For example, color combinations frequently represent gang symbols. *Gaut*, [277 Ill. App. 3d at 4], 660 N.E.2d at 261 (police officers testified that the 'best-known gang "colors" were black and gold (Latin Kings and other People Nation affiliates) and blue and black (Folk Nation affiliates)'). Indeed, the colors red and blue are the colors of our flag and the colors of two prominent gangs: the Bloods and Crips. Baseball caps, gloves and bandannas are deemed gang related attire by high schools around the country, Paul D. Murphy, *Restricting Gang Clothing in Public Schools: Does a Dress Code Violate a Student's Right of Free Expression?*, 64 S.Cal.L.Rev. 1321, 1328 (July 1991), as well as collegiate logos. *Gaut*, [277 Ill. App. 3d at 5], 660 N.E.2d at 261 (Duke University baseball cap is a Folk Nation emblem). A male student wearing an earring, *Olesen v. Board of Educ. of Sch. Dist. No. 228*, 676 F. Supp. 820, 821 (N.D. Ill. 1987), or allowing a shoelace to go untied, *Gaut*, [277 Ill. App. 3d at 4], 660 N.E.2d at 261, is engaging in actions considered gang related. Even a student who innocently refers to classmates as 'folks' or 'people' is unwittingly speaking in the parlance of the Midwestern gangs 'Vice Lords' and 'Black Gangster Disciples.' [Citation.] In short, a male student walking the halls of a District school with untied shoelaces, a Duke University baseball cap and a cross earring potentially violates the District regulation in four ways." *Stephenson*, 110 F.3d at 1308-11.

¶ 53    Thus, a photograph, posted to a social media website, that includes, in the background, a person wearing blue, or a cross, or a baseball cap, or a shoe with untied laces, or a picture of a cat in front of a blue wall, or a wall with an American flag or a crucifix may violate the probation

condition the juvenile court imposed on R.H. here. Even a picture of R.H. standing in an open field may violate the court's order—if a court decides that the depiction of the blue sky refers to a gang that uses blue as its gang color. The order as written invites arbitrary enforcement, in violation of R.H.'s right to due process. See *Chalifoux v. New Caney Independent School District*, 976 F. Supp. 659, 667 (S.D. Tex. 1997).

¶ 54    To meet the requirements of due process, the order should specify the offending symbols that must not appear in any image R.H. posts, shares, likes, or favorites on social media. To formulate the list of banned symbols, the court should seek assistance from probation officers and other persons familiar with gang activity in the areas where R.H. lives or works or goes to school or any other areas where R.H. regularly appears.

¶ 55    Finally, the court should state plainly in its conditions of probation that to show a violation of the conditions, the prosecution must prove that R.H. knowingly used a gang symbol or otherwise referred to a gang. The court must include the knowledge condition "to give defendant fair warning of what areas to avoid and ensure[ ] that he will not be found in violation due to a factual mistake, accident, or misfortune." *People v. Barajas*, 131 Cal. Rptr. 3d 412, 421 (Ct. App. 2011).

¶ 56    I agree with the majority that the juvenile court has authority to enter an order restricting R.H.'s use of social media. Because the order the trial court entered gives neither R.H. nor any court or officer seeking to enforce the order any guidance as to what postings or other actions on social media will violate the order, I must dissent from the majority's affirmance of that order.